IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:22-CV-51-FL

| | |
|---|---|
| TIVERTON ADVISORS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AGRIFRUIT, LLC; BOB JONES RANCH, ) | |
| INC.; BOBALU, LLC; ROBERT B. ) | ORDER |
| JONES FAMILY LIMITED ) | |
| PARTNERSHIP; WEST COAST BERRY ) | |
| FARMS, LLC; AGRIFROST, LLC; ) | |
| ROBERT B. JONES; and RICHARD C. ) | |
| JONES, ) | |
| ) | |
| Defendants. ) | |

This matter is before the court on defendants' motion to dismiss for lack of personal jurisdiction and for improper venue, pursuant to Federal Rule of Civil Procedure 12(b)(2) and (3). (DE 17). The issues raised are ripe for ruling. For the following reasons, the motion is granted.

**STATEMENT OF THE CASE**

Plaintiff commenced this action February 1, 2022, asserting that defendants breached a confidentiality agreement and binding terms governing negotiations for a proposed financing transaction. Plaintiff seeks damages and costs.

Defendants filed the instant motion, relying upon declarations of defendants Robert B. Jones and Richard C. Jones, as well as correspondence between the parties. Plaintiff responded in opposition, relying on a declaration of Andrew Scontsas ("Scontsas"), a director of plaintiff.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows. Plaintiff is a North Carolina limited liability company with its principal office in Raleigh, North Carolina, which "focuses on investing in agribusiness to provide long-term, value-oriented capital through loans and growth equity capital to agribusinesses across the country." (Compl. ¶ 14). Defendants are affiliated California entities, along with their owners and managers (collectively, "AgriFruit"), that grow, package and ship strawberries.

"Prior to 2019, AgriFruit borrowed money from Pacific Premier Bank ("Pacific") for working capital and other business-related needs." (Id. ¶ 16). "In 2020, AgriFruit sought to refinance the Pacific loans with [plaintiff] because its principals indicated it was having issues in its current lending relationship with Pacific." (Id. ¶ 17). "In connection with this effort, [plaintiff] and AgriFruit . . . executed a Confidentiality Agreement regarding the exchange and disclosure of confidential information" (the "Confidentiality Agreement"). (Id.). Plaintiff and AgriFruit "did not consummate a financing transaction deal in 2020." (Id.).

AgriFruit "indicated to [plaintiff] that the relationship between AgriFruit and Pacific had been souring since 2019." (Id. ¶ 18). "AgriFruit repeatedly expressed that it was unsatisfied with its relationship with Pacific." (Id.). AgriFruit "indicated to [plaintiff] that AgriFruit was required to sign a forbearance agreement in November 2020 on the Pacific loan, which increased AgriFruit's interest expense payment and extended the maturity date." (Id. ¶ 19). AgriFruit also "indicated to [plaintiff] that AgriFruit's note with Pacific was set to mature on or about September 15, 2021, thereby requiring AgriFruit to either refinance or payoff the note by that date." (Id. ¶ 20). AgriFruit further "indicated to [plaintiff] that since 2020 AgriFruit had been seeking credit

facilities from other lenders and banks to refinance the Pacific debt but their efforts were unsuccessful." (Id. ¶ 21).

According to the complaint, "AgriFruit had been negotiating with Pacific to refinance the debt or enter into a new credit facility in 2020 prior to agreeing to the Binding Terms, as defined below, with [plaintiff]." (Id. ¶ 22). "AgriFruit was unable to reach agreeable terms with Pacific to refinance the debt or enter into a new credit facility." (Id. ¶ 23).

"In July 2021, AgriFruit sought to reengage [plaintiff] to refinance AgriFruit's Pacific loans and provide working capital through a $29 million credit facility." (Id. ¶ 24). "Specifically, [plaintiff] sought to provide a loan to refinance AgriFruit's existing creditors and provide working capital for AgriFruit's business needs." (Id.). On "August 5, 2021, [plaintiff] delivered to AgriFruit a commitment letter which contained the high-level terms of the proposed financing transaction." (Id. ¶ 25). That same date, plaintiff "delivered to AgriFruit a set of binding terms governing the parties' rights and obligations during the transaction process" (the "Binding Terms"). (Id. ¶ 26). Plaintiff and AgriFruit "discussed the Binding Terms on August 5, 2021." (Id.).

"On August 9, 2021, [plaintiff] delivered a revised commitment letter [the "commitment letter"] to AgriFruit reflecting AgriFruit's requested changes to the financing transaction terms" (the "Transaction"). (Id. ¶ 27). "The Binding Terms did not change between the August 5, 2021 and August 9, 2021 agreements." (Id.). "On August 10, 2021, each named defendant executed the commitment letter and Binding Terms." (Id. ¶ 28).

The commitment letter sets forth a "financing proposal" including the following terms: 1) a loan amount of $29.0 million, 2) structured to comprise a $16.0 million "[r]eal estate note" and $13.0 million "[o]perating line," 3) with proceeds used to pay off outstanding debt to Pacific and

3

to fund operations, 4) secured by collateral including real estate, crops, inventory, and equipment, 5) at an interest rate of 5.75%, 6) with a closing date on or about August 31, 2021, and 7) maturing seven years after closing date for the real estate loan and two years after closing for the operating note. (Compl. Ex. B (DE 1-2) at 1).

The Binding Terms include the following provisions:

> 1. ACCESS TO INFORMATION. Company [AgriFruit] agrees to provide [plaintiff] or its representatives reasonable access to Company and broader enterprise management, books & records, financial statements, properties, and any other information reasonably requested within a time frame appropriate to enable [plaintiff] to complete its due diligence, underwriting, and close the Transaction by the date provided above [August 31, 2021]. Such further diligence will include, but not be limited to:
>
> a. Operational / business due diligence
>
> b. Surveys and or appraisals
>
> c. Financial / accounting / tax diligence
>
> d. Legal due diligence
>
> e. Management discussion / site visit

(Id. at 2).

The Binding Terms also include a confidentiality provision that incorporates the Confidentiality Agreement previously executed August 25, 2020. (Id.). Further, the Binding Terms provide for an "Exclusivity Period" until AgriFruit terminates by written notice or the Transaction has been consummated. (Id.). The Binding Terms also include a provision for AgriFruit to pay plaintiff's "transaction costs," such as "travel, appraisal, environmental, legal, agricultural, mapping, accounting, diligence and other general expenses," not to exceed $50,000.00. (Id. at 3). Finally, the Binding Terms provide for a "Breakup Fee" in the event AgriFruit "decide[s] to evaluate or pursue a transaction with another party . . . to provide financing

4

. . . similar to the Transaction proposed" in the commitment letter, in a twelve month period after the Exclusivity Period. (Id.).

"Between August 10, 2021 and September 20, 2021, [plaintiff] and AgriFruit engaged in the due diligence process to close the Transaction." (Compl. ¶ 29). "During the due diligence process, [plaintiff] expended significant resources and expenses to close the Transaction." (Id. ¶ 30). "In August 2021 alone, [plaintiff] expended over 500 hours of work to close the Transaction." (Id.). Plaintiff "also incurred expenses for legal services, title work, travel, and other expenses related to evaluating and closing the Transaction." (Id. ¶ 31).

Plaintiff "was prepared to close and fund the Transaction upon finalizing the necessary due diligence and paperwork." (Id. ¶ 32). "However," according to the complaint, "AgriFruit used the terms and existence of the Transaction as leverage to obtain more desirable financing terms from Pacific in violation of the Binding Terms." (Id. ¶ 33). "[P]rior to August 2021, AgriFruit had not been able to reach an agreement with Pacific regarding refinancing the Pacific debt or entering into a new credit facility." (Id. ¶ 34). "Between August 10, 2021 and August 16, 2021, AgriFruit disclosed to Pacific that it was negotiating and working to close the Transaction with [plaintiff] and that AgriFruit had executed a term sheet with [plaintiff]." (Id. ¶ 35).

"Between August 10, 2021 and September 2, 2021, AgriFruit engaged in discussions with Pacific about a financing transaction similar to and for the same purposes as the Transaction." (Id. ¶ 36). "On September 2, 2021, AgriFruit received a term sheet from Pacific for a financing transaction similar to and for the same purposes as the Transaction." (Id. ¶ 37). "[B]etween September 2, 2021 and September 16, 2021, AgriFruit continued to negotiate the term sheet with Pacific." (Id. ¶ 38). On September 20, 2021, AgriFruit provided notice to plaintiff of its "termination of the transaction." (Compl. Ex. C (DE 1-3) at 1).

According to the complaint, "[b]etween August 10, 2021 and September 20, 2021, AgriFruit disclosed Confidential Information to Pacific by discussing the existence and terms of the Transaction," in alleged breach of the Confidentiality Agreement and Binding Terms. (Compl. ¶ 43). During that same time period, extending to October 20, 2021, AgriFruit allegedly breached the "Exclusivity Period" provision in the Binding Terms by "discussing and negotiating with Pacific a financing transaction similar to and for the same purpose as the Transaction." (Id. ¶ 51). AgriFruit allegedly also breached the reimbursement provision in the Binding Terms by failing to reimburse plaintiff for "transaction expenses," and by failing to pay plaintiff the Breakup Fee upon securing alternative financing with Pacific in 2021. (Id. ¶¶ 58, 72).

Additional facts bearing on personal jurisdiction will be set forth in the analysis herein.

## COURT'S DISCUSSION

A.  Standard of Review

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a claim for lack of personal jurisdiction.[1] "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016).[2] At this stage, the court "must construe all relevant pleading allegations in the light most favorable to plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989); see Mylan Labs.,

---

[1] Where the court grants defendants' motion on the basis of lack of personal jurisdiction under Rule 12(b)(2), the court does not address herein the standard of review for a motion to dismiss for improper venue.

[2] Throughout this order, internal citations and quotation marks are omitted from all citations unless otherwise specified.

Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993) ("[T]he district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.").

B. Analysis

"A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012). Where "North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause, . . . the dual jurisdictional requirements collapse into a single inquiry" of whether personal jurisdiction comports with due process. Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001).

"For a [s]tate to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014). "To decide whether specific jurisdiction exists, [the court must] examine (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the [s]tate; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76 (1985).[3] With regard to the first prong, the touchstone of the purposeful availment inquiry is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide

---

[3] In the alternative, a plaintiff may meet the due process standard by demonstrating "general jurisdiction." ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711 (4th Cir. 2002). In this case, where plaintiff does not assert general jurisdiction exists, the court analyzes only specific jurisdiction.

7

Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). "If, and only if, we find that the plaintiff has satisfied this first prong of the test for specific jurisdiction need we move on to a consideration of prongs two and three." Consulting Engineers Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009).

"In determining whether a defendant has purposely availed itself of the privilege of conducting business in a State, [courts] have identified numerous nonexclusive factors to be considered, such as" –

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 198–99 (4th Cir. 2018); see Consulting Engineers Corp., 561 F.3d at 278. "This analysis is not mechanical," and "a court must weigh the totality of the facts before it." Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 189 (4th Cir. 2016).

Plaintiff has not demonstrated a prima facie case of personal jurisdiction. As an initial matter, several enumerated factors that are not in dispute weigh against exercise of jurisdiction. Defendants do not maintain property, offices, or agents in North Carolina. (Richard C. Jones Decl. (DE 20) ¶¶ 6-11; Robert B. Jones Decl. (DE 19) ¶¶ 7-25). No choice of law clause selects the law of North Carolina; in fact, the Confidentiality Agreement specifies that New York law governs, and the Binding Terms incorporate the Confidentiality Agreement by reference. (Compl. Ex. B (DE 1-2) at 2). Defendants made no "in-person contact with [a] resident of the forum in the forum state regarding the business relationship," Consulting Engineers, 561 F.3d at 278, and instead the

8

only in-person contact came upon a visit by plaintiff's representatives to California. (Richard C. Jones Decl. (DE 20) ¶ 14; Robert B. Jones Decl. (DE 19) ¶¶ 26-27, 32).

Additional undisputed factors in addition to those enumerated above also weigh against exercise of jurisdiction. Defendants Richard C. Jones and Robert B. Jones have not ever travelled to North Carolina, except for one golf trip by defendant Richard C. Jones when he was 14 years old. (Richard C. Jones Decl. (DE 20) ¶ 7; Robert B. Jones Decl. (DE 19) ¶ 21). Defendants are engaged in farming operations in California, and defendants Richard C. Jones and Robert B. Jones do not have any North Carolina-issued licenses, North Carolina bank accounts, or leases in North Carolina. (Richard C. Jones Decl. (DE 20) ¶¶ 8-10; Robert B. Jones Decl. (DE 19) ¶¶ 16, 22-24). "The fact that [plaintiff] was based in North Carolina had nothing to do with [defendants'] potential interest in pursuing a financing transaction with [plaintiff]." (Richard C. Jones Decl. (DE 20) ¶ 19; Robert B. Jones Decl. (DE 19) ¶ 34). Indeed, that proposed transaction contemplated the use of defendants' real estate, improvements, and crops, as collateral, all of which are located in California. (Richard C. Jones Decl. (DE 20) ¶ ; Robert B. Jones Decl. (DE 19) ¶ 35). Further, "[a]ll of the capital contemplated in the Parties' negotiations was intended to be loaned in California and deployed for use in California." (Robert B. Jones Decl. (DE 19) ¶ 34). In sum, these factors further highlight the lack of connection and contacts with North Carolina.

Although plaintiff suggests that remaining four enumerated factors favor jurisdiction, examination of each such factor demonstrates to the contrary. First, defendants did not "reach[] into" North Carolina to "solicit or initiate business." Sneha, 911 F.3d at 198. Rather, defendants were introduced to plaintiff through a third party, Scott Porter, senior vice president of Cascadia Capital LLC, in Seattle, Washington. That introduction is in the form of an email stating as follows:

9

> Joe [Joseph Rumley, AgriFruit] –
>
> I want to introduce you to Andrew Scontsas and Griff Jenkins at Tiverton Ag. Tiverton is a great investor and lender to the ag sector and I think they can be a nice resource to your situation.
>
> Andrew/Griff – please meet Joe Rumley at Bobalu Berries. Joe is working on a refi and I think it's worth a discussion.

(Robert B. Jones Decl. Ex. A (DE 19-1) at 4). As such, defendants did not "reach into" North Carolina to make initial contact with plaintiff, which is reinforced by the undisputed fact that they were not interested in plaintiff because of its location in North Carolina. (Richard C. Jones Decl. (DE 20) ¶ 19; Robert B. Jones Decl. (DE 19) ¶ 34).

Plaintiff points to a subsequent email exchange, the next morning, in which Joe Rumley states: "Thank you for the introduction, Scott. It is good to meet you via email, Andrew and Griff. Let me know a convenient time for a discussion about our business and our refinancing objectives"; and, then, plaintiff's representative responds: "Joe – great to make the connection as well, and pleased to introduce Tiverton as a lender to the ag space," suggesting a time for a call. (Robert B. Jones Decl. Ex. A (DE 19-1) at 2-3). Plaintiff also highlights the fact that, after the parties did not pursue a financing transaction in 2020, "[i]n July 2021, the [d]efendants and [plaintiff] re-engaged their discussions about a potential financing transaction." (Scontsas Decl. (DE 25) ¶ 9). These subsequent communications, however, are not on a par with reaching into North Carolina to solicit or initiate business. They are more properly considered with the course of communications between the parties after they were "first introduced." Consulting Engineers, 561 F.3d at 282.

Regarding the next disputed factor, defendants did not "engage[] in significant or long-term business activities in the State." Sneha, 911 F.3d at 198. Instead, defendants' business activities are alleged to comprise negotiations with plaintiff regarding potential terms of a

10

financing agreement, which negotiations culminated only in execution of the Confidentiality Agreement and the commitment letter and Binding Terms. (See, e.g., Compl. ¶¶ 17-21, 24-28). These executed agreements provided for plaintiff's due diligence activities lasting less than one month, and an exclusivity and "breakup fee" period extending no more than 14 months, with no guarantee of a long-term financing relationship. (See, e.g., Compl. Ex. B. (DE 1-2) at 2-3). Indeed, the commitment letter expressly states that it "does not bind [plaintiff] to consummate a Transaction with" defendants.[4] In sum, none of these activities constitute a significant or long-term business relationship between the parties, much less significant or long-term business activities in North Carolina.

Plaintiff argues that defendants engaged in significant and long-term business activities in North Carolina because the "anticipated transaction involved the exchange of $29 million dollars – a significant sum of money," the "transaction anticipated a long-term, structured business relationship" with an operating line of credit, and the transaction "contemplated at least a seven-year relationship." (Pl's Resp. (DE 24) at 12-13). However, the relevant inquiry is "whether the defendant deliberately engaged in significant or long-term business activities in the State," Sneha, 911 F.3d at 198 (emphasis added), not whether the parties were anticipating or contemplating doing so. Here, defendants did not "engage[] in significant or long-term business activities in the State," because they only contracted to keep information confidential and provide information, reimburse expenses, and maintain exclusivity during a limited time period. (Compl. Ex. B (DE 1-2) at 2-3).

---

[4] In fact, contrary to the label used in complaint, the commitment letter states that it "is not a 'commitment letter.'" (Compl. Ex. B (DE 1-2) at 2) (emphasis added). The court nonetheless maintains the label used in the complaint for ease of reference.

Plaintiff argues that this case involves "a structured, long-term business relationship more akin to the multi-year franchise agreement discussed in Burger King [Corp. v. Rudzewicz, 471 U.S. 462, 464 (1985)]." (Pl's Resp. (DE 24) at 13). This argument ignores, however, a critical difference between the two cases, namely that the defendant in Burger King had already entered into a contract containing such terms and obligations, whereas the parties here only anticipated or contemplated one. "By signing . . . final agreements, [the defendant in Burger King] obligated himself personally to payments exceeding $1 million over the 20-year franchise relationship," and "he entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King" in the forum state. 471 U.S. at 467, 480. In this manner, the defendant in Burger King had "engaged in" significant business activities in the forum state by binding himself to such activities through "continuing obligations," which engagement is not present here. Id. at 476.

With respect to the next disputed factor, none of "the relevant contracts required performance of duties in the State" of North Carolina. Sneha, 911 F.3d at 198-99. Indeed, the contracts do not even mention North Carolina as a place of performance, much less a required one. (Compl. Exs. A & B (DE 1-1 and 1-2)). Plaintiff points to the fact that it "performed due diligence related to the business transaction from its offices in North Carolina," and that plaintiff actually incurred over $50,000.00 in due diligence expenses. (Pl's Resp. (DE 24) at 10; see Scontsas Decl. (DE 25) ¶¶ 11, 19, 22, 24). Whether plaintiff actually completed work in North Carolina, or even expected to complete work in North Carolina, however, is not the inquiry covered by this factor. See Sneha, 911 F.3d at 198-99. Moreover, in those limited instances where the Binding Terms specifically describe site-specific work to be performed, the implied location is California, not North Carolina. (See, e.g., Compl. Ex. B (DE 1-2) at 2-3 (stating that defendants agree to provide

plaintiff "reasonable access to Company . . . properties"; that due diligence will include "Surveys and or appraisals" and "site visit"; and that invoices for reimbursement will be sent to defendants at their California address)).

Concerning the last factor, "the nature, quality, and extent of the parties' communications about the business being transacted," Sneha, 911 F.3d at 199, the evidence is mixed. On the one hand, the communications between the parties were numerous, comprising 90 emails, 45 virtual meetings, 47 phone calls, 60 text messages, and one in person meeting, during their 16-month relationship. (Scontsas Decl. (DE 25) ¶ 26). Of these, defendants "sent approximately 27 emails, participated in all 45 virtual meetings, initiated 12 of the 47 phone calls, and sent approximately half of the text messages" to plaintiff's representatives in North Carolina. (Id.). On the other hand, the nature of these communications highlights the California-centric focus of the parties' relationship, where these communications "related to [d]efendants' underlying business needs, finances, and projections; [plaintiff's] proposed credit facility terms and the Binding terms; due diligence and underwriting needs related to the transaction; the parties' business relationship; and Pacific's offered financial terms." (Id. ¶ 27). Furthermore, concerning the quality of the communications, plaintiff describes the sole in-person meeting between the parties as follows:

> From August 4, 2021 to August 6, 2021, a number of Tiverton representatives traveled to California to meet with several business contacts and prospective business partners. On the second day of that trip the Tiverton representatives met with Defendants for three hours to discuss the potential lending agreement, tour the site, and have lunch. Following that meeting, we went to another meeting with a different business partner.
>
> At the meeting with Defendants, we provided a copy of and discussed Tiverton's binding terms that generally accompany Tiverton's indicative term sheet and the proposed credit facility terms. The meeting consisted of spending a few hours of discussing the transaction with Defendants, taking a site tour, and having lunch. We flew home the following day, August 6, 2021.

(Id.). From defendants' perspective, plaintiff "gave us their sales pitch." (Robert B. Jones Decl. (DE 19) ¶ 32). As such, plaintiff's communications with defendants in California were critical to their relationship. While other communications between the parties are numerous, they are not sufficient to tip the scale in favor of jurisdiction, particularly where their nature is considered in conjunction with other pertinent factors and the totality of the circumstances.

Plaintiff cites to four cases where personal jurisdiction was found to exist, which plaintiff contends are analogous to the instant case. These cases, however, are inapposite by virtue of key distinguishing facts. In Vishay Intertechnology, Inc. v. Delta Int'l Corp., 696 F.2d 1062 (4th Cir. 1982), the defendant "initiated the contacts with [the plaintiff] in North Carolina," and "intended . . . to inflict foreseeable injury upon [the plaintiff] . . . arising out of those contacts." 696 F.3d at 1068. Specifically, in its "initial solicitation of price information," the defendant "deceptively identified itself," forming the basis of a tort claim for unfair and deceptive business practices. Id. at 1065. In addition, the defendant "caus[ed] service of process on [the plaintiff] in North Carolina," forming the basis of the plaintiff's abuse of process claim. Id. In the instant case, by contrast, there is no such self-initiated, direct, tortious, conduct into North Carolina allegedly inflicted on plaintiff.

In Eng. & Smith v. Metzger, 901 F.2d 36 (4th Cir. 1990), the defendant attorney "initiated the relationship with [the plaintiff attorney], knowing that [the plaintiff] was a Virginia lawyer who likely would do the requested work in Virginia." 901 F.2d at 39. The defendant attorney asked the plaintiff by telephone if he "would become his co-counsel in [a] forfeiture case on a contingent fee basis," and the court in that case noted that the plaintiff was "a recognized authority on forfeiture law and is the author of the only book on the subject." Id. at 37. The court further noted that "[f]ew examples of transacting business are more classic than [the defendant's] decision

to associate a Virginia law firm on a case and his subsequent dealings with that firm." Id. at 39. Here, defendants did not initiate such targeted contact to plaintiff, through an initial telephone call offer, directly seeking to associate on a joint work endeavor.

In Manley v. Air Canada, 753 F. Supp. 2d 551, 555 (E.D.N.C. 2010), the "defendant's Chief Executive Officer ('CEO') personally traveled to North Carolina to meet with plaintiff," in 2005, to negotiate an initial contract "to assist in preparing a strategic labor plan" for the defendant. Id. at 555. Then, "[i]n early 2006, defendant proposed that plaintiff devote the majority of his work time to defendant over the next four to five years, and after months of negotiations, the parties entered into a separate agreement on or about August 7, 2006." Id. "The 2006 agreement, the alleged breach of which form[ed] the basis for th[e] lawsuit, provide[d] plaintiff with a minimum annual retainer of $240,000.00, plus additional fees and expenses." Id. Manley, thus is distinguishable because of the initial contact by the defendant's CEO personally traveling to meet with plaintiff in North Carolina, and because of the extent and nature of the agreement governing plaintiff's work for defendant.

Finally, in Bundy v. CitySwitch II, LLC, No. 320CV00618FDWDSC, 2021 WL 4142677, (W.D.N.C. Sept. 10, 2021), the defendant's president and CEO "called his college acquaintance and friend [the plaintiff], who was at his office in Charlotte, North Carolina, in order to seek [the plaintiff's] professional advice and services." Id. at *1. "During that call, [he] requested [the plaintiff's] assistance to locate a capital partner to provide the necessary funding for [the defendant]." Id. A year later, he "again initiated contact with [the plaintiff], informed [the plaintiff] that [the defendant] had failed to secure a capital partner, and indicated [the defendant] wanted [the plaintiff to] provide services to help raise the necessary capital." Id. at *2. Bundy is distinguishable because of the initial contact by the defendant's CEO targeting plaintiff in North

15

Carolina to request services, and the CEO's additional initiation of contact and request for services by the plaintiff in North Carolina.

In sum considering the factors bearing on personal jurisdiction and the totality of the circumstances in this case, plaintiff has not established a prima facie case that defendants purposefully availed themselves of the privilege of conducting business in North Carolina. Accordingly, defendants' motion to dismiss is granted, and the court does not reach defendants' additional arguments in favor of dismissal.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss (DE 17) is GRANTED. Plaintiff's action is DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction, pursuant to Rule 12(b)(2). The clerk is DIRECTED to close this case.

SO ORDERED, this the 29th day of July, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge